Good afternoon, counsel. We will be hearing one case this afternoon, and that is Lesko v. Secretary, Pennsylvania Department of Corrections, and we will begin with counsel for the appellant. Good afternoon, your honors. Tim Cain, along with my colleague, Sam Angel, on behalf of Mr. Lesko. I'll be addressing the guilt phase issues, and Mr. Angel will be addressing the penalty phase issues, and I would like to start with and mainly focus on Claim 2, which involves Mr. Lesko's right to testify. Before we get there, could we spend some time on the threshold Magwood issue about which we requested supplemental briefing? Yes, of course. And just to start the discussion, let me put to you, Magwood went out of its way to carve out, it was not deciding how to deal with challenges to undisturbed convictions. And it talked about the invalidation that a petitioner under 2254 is seeking invalidation in whole or in part of the judgment authorizing the petitioner's confinement. And it cites twice to the Seventh Circuit's decision in Walker, which itself made the distinction between repeat challenges to sentencing versus undisturbed conviction, and said, of course, an undisturbed conviction would qualify as a second or successive petition. Why shouldn't we take those cues from Magwood to conclude that the challenge here is second or successive? Well, I think for at least two reasons. I think Magwood gives cues in the exact opposite direction, which is that the dissent pointed out that this situation could arise, the situation we're in now. And the majority responded by saying, well, you know, that doesn't particularly concern us because, and there's a footnote in Magwood which addresses this, in which it says, well, while it's true that this might mean that a petitioner gets a second bite at the apple in challenging his conviction, that doesn't concern us because that will only happen after there's been some constitutional violation found in the first place. And so the notion that there was an unfair windfall didn't move the majority. But I think the even more important point is that Magwood was interpreting a federal statute, and the language used in the federal statute that each petitioner gets a chance to challenge a state court judgment that's authorizing his custody is a federal term of art. And that term of art has, for close to a century now, in Supreme Court law, been that a judgment includes both a conviction and a sentence. Well, we do need to understand how the term judgment works there, but the court talked about second or successive as the term of art. Correct. Which suggests that when we look at the word judgment there, it may have a unique meaning, particularly where it has to encompass not only what the federal system considers a judgment, but also what an array of state systems consider a judgment. And why shouldn't we conceptualize an adjudication of guilt, phrasing that the Supreme Court itself used in Deal and Magwood as itself a type of judgment that may ultimately materialize into a final judgment, but nonetheless stand independent of the sentencing in terms of a final order? Well, I think that that would have come to a surprise to Congress when they were drafting this statute. When they were drafting EDPA, there was not only a federal understanding, but really a nationwide understanding among the states that a judgment means both conviction and sentence. And so any nuance, and I recognize that the Pennsylvania Supreme Court here sort of broke new ground in this case under its own state statute in interpreting that and saying that there is a difference. But when EDPA was adopted, there was no distinction, and the cases cited in our letter brief, I think, make clear that a judgment meant both and has for a long time meant both conviction and sentence. Why isn't that just to say that it has both component parts with a recognition that for purposes of this term of art, second or successive, that the invalidation of one part of that judgment doesn't do anything to the second that would render a subsequent challenge other than second or successive? Well, I mean, I just don't think that there's any basis in the text of the statute or in the understanding that Congress had of what the terms it was using meant to make that distinction. A judgment has always meant one thing. The Supreme Court has said that repeatedly. It has meant both the conviction and sentence. We know that in criminal trials, the conviction is not final until there is a sentence. They come together. But there's no question that the word second and successive are words of art, and Congress meant something when they included them in 2244B. Yes. So you can't ignore those words. Oh, no, quite the opposite. I mean, I think those words, but those words are in reference to a judgment, a challenge to a judgment that authorizes custody. And there's no question that the judgment that authorizes custody, Mr. Lesko's custody, is both his conviction and his sentence. A sentence can't stand apart from a conviction. Doesn't the adjudication of guilt also authorize detention? Well, I mean, I suppose any number of things could authorize detention, but the sentence – but the only thing that authorizes the sentence that we're dealing with here is the first degree murder conviction. My recollection is that the prisoner here complained of improprieties, some of which went as to the sentence of conviction, some of which went as to the judgment of conviction, some of which went to the judgment of sentence. And the certificate of appealability was granted only on issues relating to the judgment of sentence. Now, isn't that a recognition that we should not look at the conviction because the certificate of appealability was not directed at any of the guilt issues? Absolutely. This court then expanded that to include the penalty phase. Yet the whole question comes down to a jurisdictional question, which we always have authority to evaluate. Absolutely. I agree that it's properly before the court. Okay, so COAs are out there, but we still have the jurisdictional question. I agree with that, yes. Okay. And that is comprised of both the conviction and the death sentence that was issued in 1995. We have, in our circuit, Romanski, where we've already staked out the position that judgment doesn't simply mean the piece of paper that contains the judgment. Yes. And sentence, but that we will treat counts separately because they're freestanding and independent, at least in the context of capital cases. Where the adjudication of guilt is very much a separate proceeding, here involving separate juries and separated by many, many years. Why doesn't Romanski suggest we have two independent proceedings here and should bring the logic of Romanski to address the adjudication of guilt as independent and freestanding as a judgment, separate and apart from the sentence? Well, I don't read Romanski quite that way as depending on the proceedings. In fact, one proceeding can include many counts and then maybe one sentence, maybe many sentences. The line this drew, excuse me, the line this court drew in Romanski was among counts. And it said that this Magwood rule does not straddle across one charge. And then when you get a new sentence on that charge, you get to also attack the other charges that were included in that judgment. That's not what we're dealing with here. And if Mr. Alesko were here trying to attack one of his other judgments of conviction, then the Romanski rule would very much apply. But because the only guilt phase issues raised here are with respect to the first degree murder conviction, which underlies the death sentence, then they are one, and it's very much consistent with Romanski, to apply the Magwood rule count by count, charge by charge. And that's what we ask the court to do here. What concerns me here is we're in effect by, if there's jurisdiction to review your guilt phase claims, we're going all the way back to 1991 and Lesko v. Lehman. Yes. Okay. And Lesko v. Lehman was the decision of this court that gave Lesko the second sentencing hearing.  And, you know, did have the evidentiary hearing requirement on the Nichols case. But it's hard for me to understand how Congress could have ever contemplated that somebody in a position like Lesko could go back that far and have in 2021 a matter re-litigated that was finalized in 1991. Well, that may be, but to the extent that, you know, Congress is unhappy with the effects of the statute, it's Congress's job to change it. And I think that, you know, one fact here that's important to remember, and why these claims were not raised the first time around, and something that would not happen again today, I presume, is that Mr. Lesko was represented by the same counsel at trial through Federal Hages the first time. So direct appeal, state post-conviction, Federal Hages, back to resentencing, back to direct appeal, all the same counsel. And he expressed under Oakley, this is a problem, I want out of this case, you know, someone's got to look at the effectiveness of counsel in a capital case. That has never happened. And so this is an unusual case. I don't see this recurring again. I don't think the court would be comfortable hearing from me in Federal Hages if I had represented Mr. Lesko, you know, at his trial. And so there is an unusual aspect to this case. But at the end of the day, 2254 authorizes, in authorizing a challenge to this judgment, authorizes challenge to both the conviction and sentence. And it's really this court's, I think, duty to scrutinize the errors that we've alleged, notwithstanding the time that has elapsed. If we think of the judgment as that which authorizes the confinement or custody, at the point that the prior, the original sentence is vacated, on what basis, other than the conviction, is Mr. Lesko continuing to be confined? I'm not sure I follow the question. If your honors say that, I'm sorry, could you repeat that? Sure. So the court has talked about a judgment as that which is authorizing the petitioner's confinement or custody. Right. At the point that a petitioner's sentence has been vacated, say on Federal Habeas, and is going back for resentencing, the petitioner, in this case, for example, is still confined. Correct. And on what basis, if not the adjudication of guilt, is there authorization for confinement? In other words, why doesn't that adjudication of guilt meet the definition that the court has set out as that which authorizes confinement or custody? I mean, I think that at that point, there is no final judgment. I mean, once the sentence has been vacated, even if the conviction has not been, then there is this period of time when there is no final judgment. And any additional federal challenge to that would necessarily have to await a resentencing via the state court or federal court. Is that addressing your honors question? But typically in the interim, the federal court will issue a conditional writ to cover that period of time. And isn't that itself based on the existence of an adjudication of guilt? Yes, but also an adjudication of sentence. I mean, the conditional writ is sort of this legal entity which permits the correction to take place in the meantime, but really to permit the state to continue holding the prisoner pursuant to the judgment that's going to be corrected. So I'm not sure that there's really a distinction between, you know, half of the judgment is still good or half of it's not. I think it's all been invalidated or at least it's all been, you know, the state court has been warned that it will all be invalidated unless the erroneous part of it is corrected. We have taken pictures all of your time on this issue, but obviously it's one of our interests. Agreed. So let's move on from that and we'll just ensure that there's sufficient time on both sides. And with that, let's add 10 minutes. We'll see where we are. And I recognize that your counsel officer will be addressing us. By the way, is one of you going to deal with rebuttal? I guess we weren't clear on whether the court preferred to hear from the district attorney after I argued the guilt phase issues. And then if I wanted to rebut something then or if it was that me and my co-counsel would address everything and then he would address. But we can do it. You know, we're happy to do it either way. How much time are you reserving? I was reserving two minutes. We'll do that at the end after we've heard from the Commonwealth. Okay. So presuming that the court has jurisdiction, on claim two, the PCRA court found that Mr. Lesko wanted to testify for the specific purpose of explaining his lack of intent, that he discussed his desire to testify with counsel, and that counsel rested his case without calling him to the stand and without his consent. That is an express factual finding made by the PCRA court which led the PCRA court to conclude that counsel interfered with Mr. Lesko's right to testify. The presumption of correctness to this finding applies here and cannot be overcome merely by arguing a different or particular interpretation of the record. Can the Commonwealth overcome that presumption of correctness? Well, that's an open question. I would urge the court here to take the same course that it took in NARA, which is that it doesn't have to reach that question because it has not made that showing here in any event. And I'm referring to NARA versus Frank.  But there is no statutory authority in AEDPA for the state to even make that showing. So it's unclear and this court has never addressed it and the parties did not present it. And the Commonwealth did not sort of contend that it was proper under the statute. Why does there need to be something explicit giving any party the ability to rebut a presumption? The statute just states flatly that there is a presumption. It then goes on to say who has the burden of rebuttal and what standard of proof that burden holder must meet. Why does that text foreclose a respondent from being able to... Well, I think generally under statutory interpretation, if a specific avenue to overcome this presumption is given and no other avenues are given, it implies there are no other avenues. And so that would be our interpretation of the statute. Nonetheless, I think that the key point here is that the Commonwealth has not made that showing. The Commonwealth cites to the trial record the same trial record that the PCRA court cited and reviewed in making its findings. And the Commonwealth does not grapple with the additional record that was before the PCRA court and the testimony of Mr. Lesko himself, which the PCRA court specifically found credible and which is one of these findings under Miller L, which is presumed correct under 2254 E. So on the basis of those facts and those findings, we think the first prong that counsel interfered with the right to testify is clearly shown. And where the dispute really lies in this claim, I think, is in the prejudice question. And why was Mr. Lesko prejudiced by not being able to testify at this trial? And that's the grounds on which the district court denied the claim. Even on the performance side, why don't we have here an error of law in the PCRA court not accounting for a presumption of effective performance that's typically applied in analyzing a counsel's work? Well, I think a full reading of the PCRA court's opinion, in my view, shows that the PCRA court was well aware of that presumption and heard as much evidence as it could on the question and reviewed the trial record in depth on that question. But the question of the presumption of counsel having acted appropriately, that presumption is overcome where counsel rests his case without knowing that his client wants to testify and without his client's consent. So the findings of the PCRA court do overcome any legal presumption. I mean, that is what is necessary to find, to find one of these... Was the PCRA court giving appropriate weight to two contemporaneous statements, representations by counsel, that he had advised Mr. Lesko of his right to testify? And that, at least with one of those statements... Yes, and he quoted them at length. I mean, he quoted the same quotes from the transcript that the Commonwealth quotes in its brief. And he grappled with that as well, yes. And those statements are not as clear as the, you know, as the Commonwealth makes them out to be. I mean, after the one statement, it's really a one-page statement where he says he's not going to testify. And at the end of that, even the trial court is saying, well, what are you saying? He's not going to testify? And he's like, yes, he's not going to testify. And then even the next day, when the trial court colloquied the co-defendant, even then, counsel was leaving open the possibility of Mr. Lesko testifying and was describing the decision, you know, or characterizing the decision as his own. Why didn't the district court get this correcto in prejudice? Well, so I think there's two big, big reasons. First of all, you know, prejudice 101 is where a constitutional error excludes important evidence on a key issue in dispute. That's prejudice. And that's what happened here. The district court never grappled with that standard. The district court never dealt with what this court held in Palmer, which is that the exclusion of defendant's own testimony is very likely to be highly important. And that's especially true in a case like this where Mr. Lesko was the only witness who could give the testimony. Yeah, but isn't it also equally true that even if it was counsel's recommendation that he not testify, that he's likely to have saved Lesko from himself? That as a witness in this case, he could have only made things worse. No, I don't agree with that, Your Honor, for a few reasons. First of all, the heart of his testimony and the heart of the focus of the Commonwealth case for specific intent. At trial, the defense was second degree murder, right? No one was disputing his guilt of murder. His defense was second degree murder. The Commonwealth's allegation was first degree murder. So on that dispute, the question was Mr. Lesko's specific intent. On that dispute, the Commonwealth relied explicitly and repeatedly on the shooting gallery statement to Rutherford and on the I wanted to statement to Montgomery. It was those two statements that Mr. Lesko was going to rebut. He was the only witness who could do that. And the Commonwealth repeatedly at closing argument where it said the crime in this case began when Mr. Lesko turned to Ricky Rutherford and made that statement and then returns again and again to those statements. When trial counsel demurred on the first degree murder case and asked that it be dismissed, what did the prosecutor say? He said, oh no, I would simply call the court's attention to the statements that have been attributed to Mr. Lesko. Number one, you better get down, which he said to Ricky, you better get down because this could turn into a shooting gallery. And even in this court, at pages 15 to 16 of its brief, the Commonwealth makes clear that improving appellate's intent, the Commonwealth presented the testimony of Rutherford and Montgomery who testified to damning statements made by the appellant on the night of the murder. To get back to your statement, to your question, Judge Fischer, why would that have mattered to the jury and why is there a reasonable probability that the jury would have believed Lesko's denials? First of all, he was in a dispute with Rutherford who was himself a participant in the Nichols and Miller homicides. There were two people in the car with Travaglia when he shot Miller. They were equally culpable or arguably equally culpable of the events of that night and Rutherford was a corrupt and polluted source and the jury was so instructed. So Lesko's testimony on that question would have been at least as powerful as Rutherford's contrary testimony. The other thing to keep in mind on this is that Lesko's account of the night has stood the test of time. In fact, Lesko's confessions that he gave on the night of his arrest as to all four homicides have stood the test of time and have proven to essentially be true. The Commonwealth has relied on them repeatedly over the years at the resentencing, at the PCRA hearing and crossing Mr. Lesko and so forth. And there's not a meaningful fact that he testified to or excuse me that he made in those confessions that has been disputed. But he did not have an opportunity in his confession and this is an important fact that the district court missed. He did not have an opportunity in those confessions to address the accusations that Rutherford and Montgomery made about his statements because those statements hadn't been made yet. Those allegations hadn't been levied yet. In testifying, he would have opened the door to a cross on a number of not only statements but other activities potentially with his testimony. Do we take that into account in considering prejudice and what about co-counsel's observation that the flatness of his testimony was really unusual and extreme? It does not suggest in the testimony an effective witness. Can you remind me of the first part of your question? Yes. The first part of the question was the opening the door. Oh right. And the Commonwealth does argue that it would have opened the door to being crossed on the Nichols homicide which happened earlier that night and all the surrounding circumstances of getting the gun and so forth. We don't dispute that. It's fine for the court to include that in its prejudice analysis but the jury had already heard all of that. Mr. Lesko's account of that was very similar to what Rutherford's testimony was. Where they departed was on these specific statements that were given and so it really wouldn't have changed the picture of what happened that night in the jury's eyes. And in fact, Mr. Lesko's candor upon arrest about what had happened that night would have made him more credible to the jury, not less. And his statement would not have been able to be, you know, the Commonwealth did not have, could not show that his statements were misleading or self-serving in any way. Unlike Travaglia's and Rutherford's and Montgomery's that were shifting and self-serving. Other than potentially his testimony and his post-arrest statements coming in on cross, was there anything in the record that included the particular details about the Nichols killing that he had described to the police? Putting his head in first and the brick. Things that suggest additional brutality and lack of care for life that may have actually further prejudiced the jury. Well, I don't know that it would have further prejudiced the jury, assuming that stuff that information would have come in, because I think we have to assume that the jury would have followed its instructions and not. And answered, honestly, the question about whether this was second degree murder or first degree murder. I mean, all the prior criminal activity was consistent with either. And Mr. Lesko was not arguing for an acquittal or for innocence or doing anything other than acknowledging his, you know, his culpability in that crime. But to get to the second part of your other question about his flat back or what kind of witness he might make. I think the Supreme Court has long recognized and has said, like, a criminal defendant can do better than a defense counsel often in their halting eloquence. And just looking the jury in the eye and saying, no, this is how it happened. Yes, I committed an awful murder earlier in the night. But this time I didn't know that Travaglia was going to do this. I thought we were going to rob the store. That's what his confession said. That's what he has maintained ever since. And that's second degree murder. And so the murder of Officer Miller came as a surprise to Rutherford and Lesko, unlike the earlier murder. And I think that we should expect that the jury would have been disciplined in answering the question of his specific intent on this question. And not let the awful details of the earlier crimes undermine that. What about the Lovato and Newcomer murders? The trial court had excluded those. Right. But, again, wouldn't his testimony potentially open that door? I don't think so. And the Commonwealth has not argued that in its brief. In part, I think, because those were not convictions at that time. Now, in his testimony at the PCRA hearing, he was he was crossed on those on those convictions. And and nonetheless, the court found his testimony credible. And the fact that that credibility determination is binding as a matter of federal law on this court, not binding, that is presumed correct on the on this court as a matter of federal law, would make it strange for this court to turn around and say, although the PCRA court found him credible on the question of whether he wanted to testify on this specific issue. No juror could have looked him in the eye and found him credible on in his denials of what Rutherford accused him of saying. That would that would very much undermine, I think, and swallow whole what the right to testify is, which is any defendant's right, no matter how serious the crime. And perhaps even more important, the more serious the crime to look at the jury and honestly say, no, I didn't know Travaglia was going to do this. So I thought the plan was we're going to lose the cop and knock off the story, which is which is what the second degree defense was. Do my colleagues have other questions at this point? Thank you. Thank you. Good afternoon, your honors. As Mr. Cain said, my name is Sam Angel. I'm also representing Mr. Electro here today. My presentation is on claim three in our brief and claim three is the claim that counsel was ineffective for failing to investigate and present important mitigating evidence at the resentencing in 1995. That important evidence included the following extensive records in the words of Williams versus Taylor, extensive records graphically describing the defendant's nightmarish childhood. And those would be the children and youth services records that are discussed at length in our in our brief. So counsel failed to get something that Williams v. Taylor said was important. They also failed to have Mr. Lesko evaluated for brain damage. Those records, by the way, included red flags for brain damage that they didn't that they didn't get in a timely manner. And also counsel failed to adequately investigate and present civilian witnesses at the resentencing. Mr. Angel, are you are you separately taking rebuttal time? Yes. Thank you. Two minutes. And on the issue of brain damage, why isn't Dr. Levitt's failure to recognize that or to make further requests as to neuropsych testing dispositive? So that would be the court's inquiring regarding deficient performance. Yes. Of counsel. Yes. There are at least two reasons for that, Your Honor. One is that Mr. Marsh had in his file a an article that found a connection between child abuse and brain damage and also a sample motion from that would seek a neuropsychological evaluation of a defendant for brain damage. He got that in 1992 from Welsh White, who argued in this courtroom for Mr. Lesko. They were co-counsel in 1991 and Lesko versus Lehman. So he had this knowledge in his he had this important information in his file that he didn't use. So the Pennsylvania Supreme Court in that respect was unreasonable when it said that Mr. Marsh was unschooled in matters of mental health. He had an article. He had a sample motion. He didn't pursue them. And that's what Justice Todd says in her dissent. And it's really not answered. Wasn't it reasonable for counsel to rely on Dr. Levitt? Well, it was not reasonable for counsel to rely on Dr. Levitt, Your Honor. And why not? He was the expert. He was called in to evaluate Mr. Lesko on February 6th. At that point in time, there was already jury selection was already underway. He was told to provide his report ASAP, to provide it the next day. Dr. Levitt was not a neuropsychologist. He was not somebody who knew how to give those tests, who knew how to interpret those kinds of tests. And so Mr. Marsh did not get that expert who was going to evaluate for brain damage, even though he had these materials in his file. And secondly, at the PCRA hearing, Dr. Levitt made clear that if he had seen what was in those CYS records, the Children in Youth Services records, if he had seen in them that John Lesko, at the age of five or six, was observed in 1964 by a social worker for Children in Youth Services to have an unusual gait, he said, that's a red flag for brain damage. He said, if I had the records then that I had now, I would have recommended testing for brain damage. He didn't have the records at the sentencing. And in fact, the prosecution made a big point of cross-examining Dr. Levitt at the time of trial in 1995 about the records he didn't have. He said, I would like all the records I can get. He said that in the trial testimony in 1995 at the resentencing. I'll take all the records I can get, but this is what I was given and this is what I'm going for. And when Mr. Marsh was asked, Mr. Marsh, why didn't you provide the Children in Youth Services records that arrived February 10th of 1995, testimony was already being taken. They were subpoenaed on February 7th. They didn't arrive in the court's chamber until February 10th. Testimony is already being taken at the resentencing. Counsel's focus and attention is elsewhere. Mr. Marsh said, well, I wasn't going to provide them to him, and it's undisputed he didn't provide them to him. Because he'd already written his report. So Mr. Marsh was just interested in getting a report and moving on. And so the result, the problem is that counsel's failure to have Mr. Lesko evaluated for brain damage is a result of counsel's inattention. It's a result of counsel postponing his delay and delaying his preparation for this case. There are other important matters, very important matters in the Children in Youth Services records. As I said, they start in 1964 and they go on through the mid-70s for Mr. Lesko. Your honors have those records before you. They were exhibited at the PCRA hearing. They are extensive records. They graphically describe a horrific circumstance that John Lesko grew up in. At the time... Isn't there more than 10 years delay between what those records show and the time of this offense? Yes, your honor. Okay. I mean, doesn't that timeline... That's not more than 10. Actually, that's... I'm sorry. I misspoke. I'm incorrect. They actually cover right up to the time of the offense. Well, at least some of the CYS records. The CYS records actually cover up to the time of the offense, to 1979 for their account. But John Lesko was not in the care and custody of CYS. Right. I mean, yeah. I mean, the relevant part to John Lesko seems to have terminated in the early 70s. And I think they terminated their services with him around when he was 18 years old and when he went into the Marines, which would have been 1976 or 77, sometime in that time frame. Okay. So there's the whole issue of the government's failure to protect John Lesko. This is the way Dr. Levitt put it at the PCRA hearing. He said, if they had been there, then we wouldn't be here now. Very simple. If CYS had done their job, if the government had done its job, then they would have protected John from the torture and the hell holes he had to live in. And it's graphically spelled out in these records. I have excerpts. I really don't want to spend the court's time and my time reading them. I could if the court is interested. But floors that are sticky with feces and urine and living in one room and kids not dressed properly. No undershirts when it's cold outside. Unrefrigerated. So you've read. We're familiar with the records. But as the Pennsylvania Supreme Court observed, there was much of the description of that horrific childhood was already before the jury. And the Supreme Court was concluding that a decision not to seek more of that same type of mitigating evidence was within the realm of professionally reasonable judgment. Where we're talking about evidence that describes his childhood already being before the jury through the testimony of witnesses, family members, and the like, why isn't the Pennsylvania Supreme Court, if not right, at least within the realm of fair-minded disagreement? Why is it unreasonable? It's unreasonable for a number of reasons. The Pennsylvania Supreme Court said the following. I think I have it. Much of the childhood, along the lines of what Your Honor said, much of the childhood information was already admitted through the testimony. That is simply incorrect and flatly incorrect and unreasonable. Because as Your Honors know, the descriptions in the records are vastly more detailed, vastly more graphic than the two sentences. But isn't what you're saying was not, I mean, isn't that going to be cumulative? With all due respect, Your Honor, no, it's not cumulative. When you can get somebody here in the gut about what's happened to this young child, that's not cumulative. And I just want to point out what Ms. Nardone said. I won't read the children and youth records, but housing conditions were reported as being deplorable. They often went without food. The utilities were turned off. How does that compare to what's in the records? It does not. And, secondly, the important point is that this institutional failure, Barbara, as I mentioned, where Dr. Levitt testified about it, and one of the- Just because there's someone else to blame doesn't necessarily exonerate Lesko in the minds of a reasonable juror. Well, Mr. Lesko, counsel's job was not to exonerate Mr. Lesko. Counsel's job was to put forth any evidence from which the jury could determine that a life sentence would be appropriate or that death would not be appropriate. And this, I think we have to take- I respectfully submit Dr. Levitt's testimony at the PCRA was not contradicted. And the children and youth services caseworker who had John Lesko in 1969, right after he was removed from the home, her testimony is not contradicting. She said he should have been taken out- those children should have been taken out of that house over four years beforehand. But wasn't sufficient evidence along those lines presented- I mean, the jury found among mitigating factors his horrible childhood. And that they did. So it isn't a real problem that they concluded that the aggravating factors outweighed those mitigating factors. And that they did. But they didn't have that institutional failure in front of them. They didn't have that the government failed John Lesko. That's undisputed. And the Pennsylvania Supreme Court does not discuss that. Does not discuss that. And it's in Judge McCormick's opinion. It's in the dissent. And they don't discuss it. And that is an important area that they overlook. And that makes their decision both unreasonable factually and unreasonable as a matter of law. Because as we know, under Sears v. Upton, Strickland requires a probing and factual analysis. There was no probing and factual analysis. It was a gloss over by the Pennsylvania Supreme Court regarding those records. And so I submit that that is unreasonable and that gets us to prejudice because that's an important factor. And that gets us to de novo review by your honors right here. If there's an unreasonable determination of fact or there's an unreasonable application of clearly established federal law, which Sears is and was, then we get to de novo review and your honors get to make that decision. And I'm running out of time here, your honors. I would just like to say that this is – we've said a lot in that brief. The Pennsylvania Supreme Court's decision was an unreasonable application of many cases, Williams, Wiggins, Ronpilla, Sears, and Porter. If counsel had done their job here, they would have presented evidence that the government failed to protect John and have him properly cared for. His brain damage, which I haven't talked a lot about, but it helps explain the crimes because of the impulsivity related to brain damage, and that's part of it. And we know from the evidence that counsel did put in that Mr. Lesko changed his life for the better in prison, and he's helping other inmates. So a compelling narrative – put this all together – a compelling narrative is provided in which it spans Mr. Lesko's entire life and it favors sentencing Mr. Lesko to life. The jury did, though, hear testimony about diminished capacity. It did hear testimony about diminished capacity. It did not, however, find that Mr. Lesko met the E3 mitigator, which is that his ability to conform his conduct of the law or ability to appreciate that his conduct was criminal was substantially impaired. And again, Dr. Crown provided that, and that was – that's a whole new statutory mitigator. So you have a new statutory mitigator. You have an important new – you have an important new mitigator in terms of institutional failure, which would come in under E8, the catch-all mitigator. And then also you have the vivid description of his childhood, and the jury didn't hear about that. It did find, though, that he was under the influence of extreme mental and emotional disturbance. It did find that. And the brain damage actually helps with that. The brain damage lifts up and gives that more weight. This court in Bond has said that not only do we have to examine – and Bond was an AEDPA case. Bond was an AEDPA case across the board in terms of deficient performance and in terms of prejudice. And this court in Bond said we have to consider not only the qualitative – not only the quantitative, the numbers of mitigators and aggravators, but we also have to understand the qualitative or look at that. And I would just note that this is a standard of whether it's reasonably probable, whether there's a reasonable probability that one juror would vote for life. And a reasonable probability, as said in Strickland, is not a preponderance, but it's less than a preponderance. So I submit to your honors that by not looking at institutional failure, by not giving the kind of attention it should have to brain damage, which the United States Supreme Court has said is very important in Porter and in Sears and in Williams, and there are – for instance, in Rompilla, brain damage is an extreme mental disturbance impairing cognitive function. That appears nowhere in the Pennsylvania Supreme Court's decision. In Porter, organic brain damage can explain impulsive, violent behavior. That appears nowhere in the Pennsylvania Supreme Court's decision. Instead, the Pennsylvania Supreme Court puts organic brain damage in quotes as if it's something that's not real. I mean, how can you explain, quote, unquote, organic brain damage? That's how they say we're not giving relief based on, quote, unquote, organic brain damage. It's undisputed. It goes to E3. The Supreme Court says it's important. And that – this brain damage, this institutional failure of the government to protect John and siblings, and the additional detail does a lot more than just barely alter the same thing. Counsel, the argument that you're making today about a separate mitigating factor in the government's failure to protect, as distinct from the substance of the records in terms of his experience. Yes. Was that argued as a separate mitigating factor before the sentencing court? I'm sorry. In 1995, was it argued? In resentencing? In resentencing. Or at the PCRA? In resentencing. It was not presented in resentencing, Your Honor, by the defense. Thank you, Your Honors. I'll be back on our phone. Thank you. Mr. Peck. Good afternoon, Your Honors. I'm John Peck on behalf of the Commonwealth, along with Elizabeth Ranger, an assistant district attorney. I'd like to address Mr. Cain's argument regarding the defendant's failure to testify. I'm sure the court has to be puzzled by the record, because Mr. Marsh was an experienced lawyer. He was trusted by the court. The court appointed him to represent a person in a very, very serious case in Westmoreland County. Excuse me. Was he experienced in first-degree murder cases? Well, he was in the Navy in the judge-advocate court trying criminal cases after he graduated from the University of Michigan. So was my brother. He probably didn't do many first-degree murder cases. But he was an experienced lawyer, and I think much of that transfers to trying any type of case. You know how to prepare witnesses. You know how to cross-examine a witness. You know how to convince and persuade the jury with evidence. But at any rate, you have to be troubled by the fact that Mr. Marsh makes two statements in front of the court about the need to talk to Mr. Lesko by his testifying, that he was advising him not to, but he wasn't certain he was going to follow his advice, and then subsequently coming back to the court, and again on the record telling the court that Mr. Lesko would reluctantly follow his advice and not testify. Now, Lesko has offered to say, well, I wanted to testify because I wanted to say that I never said to Rutherford, the person who was in the back in the car, that this would become a shooting gallery. Just that. But if you put it into the context of this trial, Rutherford had testified that he was in the car from the very beginning when they picked up Mr. Nichols and basically carjacked him or kidnapped him from the Edison Hotel in the city of Pittsburgh. That it was, in fact, Rutherford who handcuffed him in the back seat of the car. At some point, Lesko got in the back seat of the car and began really to taunt and torture and to try to disrespect Mr. Nichols because of his sexual orientation. At one point, he got the ashtray in the car and he stuck that in his mouth and made him swallow those ashtrays, continuously beating him from Pittsburgh all the way to Blue Spruce Lake in Indiana so that he was unconscious by the time they arrived. And at that point, they asked Mr. Rutherford to get a brick or a rock that they can tie to him and Lesko and Travaglia drag Nichols down to a lake where they've broken the ice and push him into the ice. And someone comes back and says, well, you know, he came up, we had to push him in again. Now, that was absolutely devastating testimony given by Mr. Rutherford. Now, the simple fact that Mr. Lesko would take the stand and say, well, I never said that this would become a shooting gallery because that's somehow going to do away with all the evidence that Mr. Rutherford just testified to and all the motivation at that point for Lesko to be involved in this homicide because he also, Rutherford also pointed out that when they came back from Blue Spruce Lake on the way back, they stopped at Travaglia's father's house and it was Lesko who went in and stole a gun. When he realized that he needed more effective ammunition, he went back, they went back, and he sent Rutherford in to get more ammunition. Now, why do they need a gun? Why do they need better ammunition? Well, he admits that there was a plan that they were going to rob the convenience store in Apollo. That plan was thwarted by the fact that Officer Miller was sitting on the street there, parked in a police car, and they saw him. They're driving an unusual car at that time in the early morning hours in Apollo, Atlantia. It's a stolen car. They've got a gun in the car that's stolen from Mr. Travaglia's father, and they have Mr. Nichols' wallet. And they have this plan that they want to complete to rob the convenience store. Now, doing away with Officer Miller obviously would take out the problem of his presence in robbing that store. I mean, that's what is admitted and uncontradicted about the testimony of Mr. Rutherford. Mr. Peck, I think you're making a persuasive argument on the factual questions, but we're dealing with a right to testify here, and that was the issue I believe you started to address. Right. Go ahead. I mean, just trying to – we don't have unlimited time here, but trying to hone in on this specific question. And I think Mr. Cain referenced it, that this is a fundamental right here. And if, in fact, there was deficient performance on the fundamental right, where does that take us on the prejudice problem? Exactly, and that's what the bottom line is. In view of that type of testimony, where is there a reasonable likelihood that Mr. Lesko could change or persuade the jury to disregard all of Rutherford's testimony? That testimony is already in, right? It's already in. Right, and so he says you're absolutely right, but still I did not say so-and-so. Doesn't that have a certain effect? After the jury hears what he had done to Mr. Nichols, I would say it had absolutely no effect. It would have no effect whatsoever. I mean, they've heard how terrible this person has done, the horrific acts that he committed against another human being. He killed the person just hours before this. He kills Officer Miller before Officer Miller is killed by Travaglia. I mean, I don't think a jury is going to be leaning in his direction and wanting to believe this one – his statement that, no, he's lying about the shooting gallery. And what evidence is there that he would make up this statement about the shooting gallery? Well, you know, we just don't know how the jury would react. And that's why we say that he ought to have the chance to testify if he's insisting on it, isn't it? That's right, it is. And he certainly does have that right. But I think it was strategically, tactically, legally making more sense not to have him testify because that entire episode that was revealed by Rutherford would be brought up again by the prosecutor when they cross-examined Lesko about what he did and didn't do. Mr. Craig, I want to just untangle these two parts of the argument because you've spent a lot of time talking about prejudice, and we understand the facts you've described. But now you're talking about deficient performance, which you moved past quickly. Are you conceding that that portion of the findings of the PCRA court that Lesko articulated his wish to testify and that was overridden by Mr. Marsh, that that was correct? Are you conceding that and focusing on prejudice? Well, no, I don't concede that Judge McCormick was correct in making that decision based on what Mr. Marsh said and having tried another resentencing trial with Mr. Marsh. Well, on that prong, what do we do with the fact that so much of the PCRA court's analysis was dependent on its credibility finding? And how are we in a position to second-guess that? Well, you may not be a judge in all honesty, but there still is a prejudice prong, and I don't believe that had he testified, it would have made any difference in the case. He has not shown that he was prejudiced by failing to testify because the evidence was nothing short of overwhelming. Similarly with the statement that was made by Montgomery that attributed to Lesko, I wanted to kill a cop. Now, that doesn't say he participated. I think there's an overstatement as to the value of that. Of course, it's important testimony, but he didn't say he killed the cop. He said, I wanted to. I think that arguably that's a case that Mr. Marsh would have argued, well, that's simply a piece of braggadocio. That's what he's saying. Do you acknowledge there's a value to the defense in just the fact of the defendant testifying? You've honed in on the two statements, but the testimony wouldn't have just been as to two statements in isolation. It would have been the opportunity for the jury to observe Mr. Lesko and hear him speak directly. Yeah, and I would think that that's all speculative because they've only referenced those two statements as to what he wanted to testify. I mean, that's their claim, that he was prohibited or kept from testifying about, I didn't say I wanted to kill a cop. I didn't say get down, this is a shooting gallery. And to move forward to the resentencing trial is Mr. O'Leary, who was his lawyer at the time, said the case was lost after he was cross-examined in that trial. So he wasn't an effective witness, at least in 1995 when the case came to trial, and he took the opportunity to testify. Mr. Peck, you're talking here about the right to testify question. Take you back a step. Is that jurisdictionally properly in front of us? Or was it jurisdictionally properly in front of the district court? Well, I guess, you know, we'll find that out when this court decides this case and the Supreme Court gives us a final opinion about that. And I agree with Your Honor that it's clear in the Magwood case that they left that question open. And it seems to me that they would have left it open because they didn't believe that a defendant should have a second bite of the apple and go back to the guilt-based trial after he's appealed the entire case and now raise issues that weren't raised in the first route of habeas corpus. But it could also be, as Judge Sykes suggested in the dissent in Suggs, that it's just putting that to the side and not suggesting it should be treated any differently. That's true. They could very well do that. When we look at the text of Magwood, it seems to be indicating that we should look at a judgment. It's judgment-specific, not claim-specific. In asking us to look at guilt separately from sentencing, aren't you, in effect, asking us to treat claims that go to the trial phase as somehow still second and successive, whereas claims related to sentencing are covered by Magwood? How could we do that consistent with the Supreme Court's pronouncement that we should not be doing this claim by claim? Well, because I think you touched upon earlier that there are really two separate adjudications. There were two separate trials in this case. There was a guilt-phase trial and there was a penalty-phase trial. And he raised all those issues, many issues, both in the guilt and penalty-phase trial before the Pennsylvania Supreme Court and the PCRA and then eventually before the federal courts where he was granted a new resentencing. He didn't take issue with that. He accepted that. Now, you know, after he was resentenced and after the Supreme Court dealt with that resentencing appeal, he came back and filed a PCRA and raised guilt-phase issues that I don't think should be covered under Rita Habeas Corpus simply because they're raised 20 years after the fact. I mean, his trial was in 1980 and he filed a PCRA in 1991. But the vast majority of our sister circuits that have addressed this question disagree. They do. But not always in death penalty cases. You know, many times it's whether a part of the judgment was disturbed or not. I mean, many of the cases deal with, you know, some counts were thrown out and other ones were untouched. Why would it be a different rule or understanding of judgment for death penalty cases? Well, simply because of the type of case the death penalty is. None of those are bifurcated trials. We, in fact, have two trials with one jury who hears two separate cases. But would that mean that adjudication of guilt constitutes a judgment for purposes of death penalty cases and not for other cases? I think it would. I think it would require that, yes. And where is there a textual basis for that in the statute? It's not really in the text, John, to be perfectly honest. You know, I've read Magwood. Obviously, the court knows Magwood. And, you know, it certainly seems to be leaning towards granting a petitioner a second chance to raise all the issues. I mean, if you read the case and apply it to our situation, it seems to be what they're saying, even though they said we're not saying that. So we leave that for another day. The Tenth Circuit doesn't even address Magwood, and the Seventh is the panel considers itself bound by prior precedent. So, in effect, if we were to adopt your position, we would be creating a circuit split, right? Yes, we would. Which may be why you referenced at the outset that the Supreme Court may be the one to resolve this. I think they have to, if they decide to take that part of the case. If we don't agree with your position, does it really open the floodgates to claims as to the guilt phase? In reality, as a practical matter, wouldn't it be the case that a state court on collateral review would have its own rules, for example, as to the timeliness of a claim relating to the conviction? And we would then be deferring to that procedural rule as long as it was an independent and adequate rule, right? To some extent, but we have that rule in Pennsylvania. Some of his claims he defaulted upon, according to the Pennsylvania Supreme Court, but nonetheless, we're here today on his guilt phase claims. But the problem there is that the court identified this as a novel issue, right? And Pennsylvania also had its own relaxed rule, so it didn't meet the adequacy requirement. Right. But for other states around the country, and perhaps for Pennsylvania going forward, this wouldn't be expected to be an issue that comes up often, even if we were to disagree with you. Well, it may not come up often, but it will come up. I mean, you have to admire the diligence of the Defenders Association in terms of going through these records with a microscope and picking out every single thing that can possibly be a basis for a new trial. So, I mean, you have that type of conscientiousness and diligence and enthusiasm for their work. So, I believe it will come up. Will there be a deluge? Probably not, because there's not enough of these cases. They may fulfill their duty and obligation to be zealous advocates. Right, and I don't have any objection to that. But state procedural rules might preclude federal review in any event, right? It may. The other point that I would just address briefly also is about concerning the resentencing and the failure of Mr. Marsh. He put on a very workmanlike resentencing defense, in my opinion, and it's a Supreme Court found. The defendant testified, so the jury got to meet him for what that was worth. His family members were called. His family members, as you know, many witnesses don't. Mr. Peck, did you handle that resentencing? I did, Your Honor. And, you know, as a lawyer, we know witnesses say one thing, write one thing, and can appear entirely different on the witness stand and can be cross-examined about their own lack of truthfulness on many occasions. He had Mr. Ardon do a background of the defendant and bring forth all this evidence that he acquired from talking to family members, to people that taught him, people who were at the Holy Family Institute and the priest who were at the Holy Family Institute, as well as his records from the military and the schools, and was able to present that, you know, through a very believable lens. You know, to say, well, that's not good enough. That was the way he tried it, and he was obviously persuasive because some of the jurors found mitigating circumstances. The allegation of ineffectiveness is not simply reliance on her to conduct an investigation. It's the time that she was allocated and the stop-and-starts in payment that ultimately led Mr. Ardon herself to say that her presentation, her ability to investigate, it was insufficient. Why doesn't that on its face indicate ineffectiveness? Well, it's arguably a basis for ineffectiveness, but if you read her testimony, she was very thorough and diligent and I think persuasive in terms of giving us John Lesko's background. And I think it was compelling and persuasive to the jury who found mitigating circumstances, I would suggest, based in part on her testimony. And it's filtered through her lens. There is no ability to cross-examine her about her credibility. We take her as a truthful person. She was a professional person who did this for a living to some extent. Do you agree it's not just positive that there was a mitigating factor found? Yes. Because if that mitigating factor had been considered more weighty by the jury, then in doing its balancing, it might have reached a different conclusion. Possibly. In the resentencing trial, there were two additional homicides that were brought forward and explained to the jury. Those two were crimes that were horrific. The argument about, well, he had organic brain damage or some kind of organic brain disease. I mean, those crimes, though, show Lesko acting very deliberately and conscientiously to commit a goal. That was to kill these people. Marlene Soon, newcomer, and Peter Lovato. And he did it with a total effort. He was successful in killing those two people and getting away from being apprehended for a time. Similarly with Mr. Nichols. There was a cold-blooded, callous plan that he had that he carried out. You can argue we had brain damage, but that's no defense to this crime. But it wasn't being raised as defense. This was being raised for purposes of enhancing the mitigation factor. Yeah, but I agree, Your Honor. But on the other hand, you look at his behavior. Well, how does that explain his behavior, particularly over the course of a week? Impulsive. This is not a deliberate thinking person. This is a person who, because of brain damage, acts on impulses without even thinking about them. Well, Your Honor, if you look at the four homicides, though, I suggest there was very little impulsivity in those four crimes. I mean, they were crimes that began and weren't instantly committed. They were carried out over a period of hours. Two of them were excluded, right? In the first trial, yes, but in the resentencing, obviously, the jury heard about those other two, heard Lovato and newcomer's homicides as well and the details of them. And finally, the police officers killed in cold blood. That's an overwhelming amount of aggravating circumstances that all had an emotional impact, I would suggest, on the jury. To clarify the record, the Commonwealth conceded at the PCRA hearing that Mr. Lesko did suffer brain damage, correct? I don't know if we conceded on the record, Your Honor. We did not dispute it. If I could say that, I don't remember where we didn't offer any contradictory evidence. We relied on the fact that Mr. Marsh relied on Dr. Levitt and it wasn't up to Mr. Marsh to find that he had brain damage. It was Mr. Levitt, Dr. Levitt's duty to do that. And it's not Mr. Marsh's fault that he didn't find it. I mean, he said he had sought out two additional mental health experts in addition to Dr. Levitt and they refused to help him. So they couldn't help him. We have Dr. Levitt's own testimony that had he been presented with the CYS records, that he would have reached, he would have conducted that further investigation. Right. And if, as I believe we have in the record, the Commonwealth said at the hearing that we were beyond that now and that he had organic brain damage, that that was not being disputed, why putting those two things together isn't there both deficient performance and prejudice to the extent that organic brain damage is materially different and might have been persuasive to a single juror than just extreme mental and emotional disturbance? Well, I would say that the Supreme Court didn't, our Supreme Court did not find that to be the case, that his performance was not deficient, that they found his performance adequate and competent. I don't think that another diagnosis, the pin on Mr. Lesko would have made any difference in the long run simply because of the overwhelming, as I said, evidence of aggravating circumstances. You can call it brain damage, but I think the jury's going to say, well, what was his behavior? What did he do? And when that's laid out in front of the jury, you don't see anything but a normal person committing crimes, the most horrific crimes. And I'm not sure that a jury finds that as a basis not to impose a death penalty. It wasn't as if he was mentally limited, he didn't have the capacity to form intent. I mean, that's not part of it. Isn't that exactly what a jury could have inferred from a diagnosis of brain damage? But I think that's counterbalanced by the fact that the Commonwealth put in evidence the four separate homicides and how they were committed, and I think that certainly trumped another medical label for Mr. Lesko as well as the fact that the last person killed was a police officer. Thank you very much. You've asked me to confirm the judgment of the district court. May I, before you leave us down, just ask you about the issue of the presumption of correctness and where, in terms of the findings that he had or had not advised his client to testify, whether your reading is that the Commonwealth, assuming it is able to rebut, also needs to do so by clearing convincing evidence? Yeah, and I don't think, based on Judge McCormick's findings, I don't think we were able to do that, nor did we argue that. We accepted his finding for what it was worth. We didn't agree that it was correct, but we didn't think that based on the advice he gave, that Mr. Lesko was trapped in the long run. At the end of the day, so to speak, he was not prejudiced by failing to testify. He would have hurt himself, and he couldn't overcome the devastating evidence of Montgomery and Rutherford that he wanted to contradict with one sentence for each other. But you confirmed earlier that you were contesting the Deficient Performance Prong Effect, the finding that was made that he either had not advised Mr. Lesko or, knowing that Mr. Lesko wished to testify, nonetheless overrode that. You are seeking to rebut that finding? I think it is rebutted by the record, Your Honor. My question is, do you agree the standard is clear in convincing evidence? I do, Your Honor. I do. And you think the Commonwealth does have the right to try to rebut the presumption of correctness? I think we do. Okay. Thank you very much. Thank you. On the issue of prejudice, Mr. Peck described at length the Nichols homicide as proving, as I understand it, Mr. Lesko's specific intent to kill Officer Miller. Whatever arguments the Commonwealth can make about that, it didn't make those arguments at trial. At trial, its focus in proving Mr. Lesko's specific intent was on the two statements that Mr. Lesko's testimony would have denied. And that's why there's prejudice. I would also call this, of course, attention to its prior statement. Yes, but now you're talking about the sentence in here. No, no. I'm talking about the guilt case. You're talking about PCRA here? No, no. I'm talking about the 1981 trial as to the specific intent, the right to testify. All right, the right to testify. I know we're shifting back and forth. Yeah, okay. Yeah, all right. So you're going way back. Yes, I'm going way back. You're going 40 years ago, not just 20. It's like yesterday. Go ahead. So I think the prejudice analysis has to be looking at what the jury was confronted with. And at trial, that argument wasn't made that the Nichols homicide proves Mr. Lesko's specific intent at the Miller homicide. Rather, the argument was these two statements prove it. And in fact, this court, going way back to its first opinion in this case, in explaining why the admission of the Nichols homicide could not have been a due process violation, could not have been unfair to Mr. Lesko, said the prosecutor in summation referred only briefly to the Nichols murder without mentioning a single detail. So there wasn't that sort of reliance on that homicide to prove specific intent. Yeah, but now you've thrown in, you know, you've moved forward to claiming the right to testify. Right. Which was first brought up in 2011. Where am I getting? First brought up in 1999 in the PCRA. It was first brought up in the PCRA. It was first brought up as soon as Mr. Lesko got new counsel. That's how I would describe it. OK. New counsel instead of old counsel. We'll grant you that. But the question about what impact the testimony would have had by necessity brings in some of those other elements. Because if he had testified, he'd have been subject to cross-examination about some of those other elements. Absolutely. So that goes into the prejudice package. Absolutely. Although I think Judge Roth made the observation that that Nichols homicide testimony was already in front of the jury. So Mr. Lesko would have been confronted with it, but it wouldn't have been new information to the jury. And the fact that the – Well, it could have been new information to the jury because Rutherford wasn't at the lake. He was. Whereas Lesko was. Well, I mean, they were all – Rutherford was in the car. Right. Lesko was at the lake. So if he testifies, there's a likelihood that he'd have been asked questions about what happened at the lake, which were contained within his confession. But as I understood Rutherford's testimony and as it was just described by Mr. Peck, it included what happened at the lake, the tying and the throwing under the water and him coming back up and so forth. So – because that was part of the discussion. Whether Rutherford saw it or not, he testified about it based on the defendant's discussion among themselves. So it wouldn't have been a new fact. The only other point I wanted to make is that Mr. Peck says that Mr. Lesko's resentencing testimony undermines the notion that he could have been a credible witness. But Mr. Lesko's resentencing testimony did not – the resentencing proceeding as a whole did not address intent as a matter of law, the Pennsylvania Supreme Court so held in its opinion at 15-8-3-372. And moreover, the two statements that the Commonwealth relied on to prove intent didn't come up in his testimony at that resentencing proceeding at all either. Unless there are further questions? Thank you. Thank you. Mr. Peck told this court words to the effect that there was no basis for the jury to question Ms. Nardone's credibility at the trial that she was that kind of a witness who I guess was a Teflon witness. The record bears out something quite different where she was cross-examined extensively by Mr. Peck on the fact that she was biased. He wanted to know repeatedly how she was paid. Wasn't she paid by the defendant? And then questioning her repeatedly about, well, did you see the police statements in this case? Why didn't you look at the police statements in this case? Weren't the police statements important? Again, suggesting bias and that she was not to be believed or credible. So Ms. Nardone, as presented today, that's an inaccurate picture that the Commonwealth presents to the court about how the resentencing proceeding proceeded regarding Ms. Nardone. The Commonwealth says that brain damage isn't applicable here or shouldn't be applicable because these weren't impulsive acts. I think the court can read the record and decide whether the acts are impulsive or not. But they certainly also show impaired judgment and impaired reasoning. And they are also symptoms of brain damage. In fact, after the sentencing, when Mr. Peck is cross-examining John Wesko, he says to him, You had problems with self-control as a teenager, right? Mr. Wesko agrees. Mr. Peck is trying to use that lack of self-control at that point in time as something that he's against Mr. Wesko. But that lack of self-control, which you can trace back to his childhood through the CYS records, that's evidence and indications of brain damage. And if the jury had heard that, the jury would have had a better understanding of who John Wesko is. The brain damage not only is a mitigator, it's not only a statutory mitigator, but it also helps lessen the aggravating circumstances. It really is very important. Mr. Peck says that in 1981, Mr. Marsh sought out two additional experts. And the response to that is, yes, he did in 1981, and he sought an additional expert in 1995. So the fact that he had two experts back in 1981, he's facing a new sentencing. There's new materials, perhaps, or old materials to look at that weren't looked at. And the fact that he had two experts has no bearing on whether or not he has a duty to investigate in 1995. And he understood, at least to some very limited extent, that he did have that ability, that that was necessary. Unless the court has any further questions, that concludes my presentation. Just if you could address the standard here. You've laid out many good reasons why a court that was reviewing these circumstances on direct review might come to a different conclusion than the Pennsylvania Supreme Court did. But we have to apply a deference to the Pennsylvania Supreme Court's determination that there was a reasonable investigation here. So could you speak to how you overcome that standard, which is a very high one? May I return to get my other notes, Your Honor? I apologize. Of course. Going through this record, the court will see that there are multiple ways that it can find or determine that the Pennsylvania Supreme Court's decision is not entitled to a deference. There are unreasonable determinations of fact. I've mentioned some of these. Counsel was unschooled in mental health matters. Not true. He had sample motion. He had the article on brain damage. The court said, this is not a case where counsel failed to act on potentially powerful mitigation, staring them in the face. And factually incorrect. He was in Judge Caruso's chambers. They were in Judge Caruso's chambers briefly, recursively, as the PCRA court said, reviewing powerful mitigation, the CYS records, staring them in the face. They didn't use it. Nor is it a case, the Pennsylvania Supreme Court said, where counsel conducted minimal investigation and failed to uncover evidence that was immediately available to him. Again, the CYS records. And those records are important for all the reasons that I said earlier. There's a very interesting statement in Wiggins, Your Honors, which says that partial reliance on erroneous fact findings highlights the unreasonableness of the state court's decision. I submit to Your Honors that that is true here. That the Pennsylvania Supreme Court, in excusing or trying to excuse Mr. Marsh's conduct and Mr. O'Leary's, though Mr. O'Leary was only retained two days before jury selection, he tried to do the best he could. But that highlights the unreasonableness of their decision, not only with respect to efficient performance, but also with respect to prejudice. In Ronpilla, the United States Supreme Court said that the Pennsylvania Supreme Court acted in a way that was objectively unreasonable in concluding that counsel could reasonably decline to make any effort to review the file, despite the easy availability of the file. Almost the same thing here. There's no thorough investigation here. That's contrary to or unreasonable application of Williams, Wiggins, Ronpilla, Porter, and Sears. What happened here was a result of inattention. How do we know that? Second counsel was only obtained two days before jury selection. These records were only subpoenaed once jury selection was underway. Dr. Leavitt was obtained on February 6th and told to get a report the next day. These are a number of areas in terms of unreasonable application of clearly established federal law. These are a number of areas that show that the Pennsylvania Supreme Court unreasonably applied clearly established federal law with respect to deficient performance. But there's more with respect to prejudice as well. Sears versus Upton. Prejudice is never limited to where there is little or no mitigation presented. This is a case where the Pennsylvania Supreme Court seems to be saying we got four versus four, and it's not going to make a difference. That's the gist of the decision, but that's not how it works, according to Sears. And I've already told the court about Bond, where this court decided that counsel could have introduced evidence that was upgraded dramatically in quality and quantity. I think the court should look at that here. Strictly requires a probing and fact-specific analysis that was not done with respect to the CYS records, and that has a ripple effect across the entire case. And Porter, as in Porter, the Pennsylvania Supreme Court did not consider, as I've outlined, or unreasonably discounted the post-conviction mitigating evidence. And so those are some areas where I think this court could look to to determine that the Pennsylvania Supreme Court's decision does not survive, and then the court should go on and make its own decision with respect to the claims. Thank you, Your Honor, very much. Thank you. Our thanks to both counsel for an exceptionally well-briefed and argued case today, and we will be taking this serious and important matter under advisement. Thanks, all. Thank you, counsel. I thought you said 530 AM. Thank you. Thank you. Thank you. Thank you. Thank you. I think you're live.   We're live.   Thank you. Thank you. Thank you. Thank you.